**BRISTOL–MYERS SQUIBB COMPANY and E.R. Squibb & Sons, Inc., Plaintiffs–Appellants,**

v.

**ROYCE LABORATORIES, INC., Defendant–Appellee.**

No. 95–1502.

United States Court of Appeals,
Federal Circuit.

Nov. 1, 1995.

Rehearing Denied Dec. 8, 1995.

Robert J. Brookhiser, Howrey & Simon, Washington, DC, argued for plaintiffs-appellants. With him on the brief were Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York City, and Donald J. Barrack, Bristol–Myers Squibb Company and E.R. Squibb & Sons, Inc., Princeton, New Jersey.

Milton A. Bass, Bass & Ullman, P.C., New York City, argued for defendant-appellee. With him on the brief were Jacob Laufer and James N. Czaban.

Before SCHALL, Circuit Judge, COWEN, Senior Circuit Judge, and BRYSON, Circuit Judge.

SCHALL, Circuit Judge.

Bristol–Myers Squibb Company and E.R. Squibb & Sons, Inc. (collectively, "Bristol") own United States Patent No. 4,105,776 (the "'776 patent"), which claims the drug captopril. In this action, Bristol appeals from the August 24, 1995 order of the United States District Court for the Southern District of Florida in *Bristol–Myers Squibb Co. v. Royce Labs, Inc.*, No. 95–1682–CIV–DAVIS, 1995 WL 568395. In its order, the court granted the motion of Royce Laboratories, Inc. ("Royce") pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss, for failure to state a claim upon which relief could be granted, Bristol's suit charging Royce with infringement of the '776 patent. The court also granted Royce's motion to set aside the statutory bar against the Food and Drug Administration ("FDA") approving Royce's abbreviated new drug application ("ANDA") for a generic version of captopril. We reverse and remand.

## BACKGROUND

### I.

Two laws are at issue in this case: The Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 (1994) and 35 U.S.C.A. § 271(d)–(h) (West Supp.1995)) (the "Hatch–Waxman Act"); and the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) (codified as amended at 35 U.S.C.A. § 154 (West Supp.1995)) (the "URAA"). We begin with the statutory scheme.

A. *The Hatch–Waxman Act*

The Hatch–Waxman Act amended the Federal Food, Drug, and Cosmetic Act, Pub.L. No. 52–675, 52 Stat. 1040 (1938), (codified as amended at 21 U.S.C. §§ 301 *et seq.* (1994)) (the "FDCA"), as well as the patent laws, in several important respects. Under the FDCA, the FDA is responsible for determining whether a generic drug product should be approved for sale to the public. 21 U.S.C. § 355(a). Pursuant to the Hatch–Waxman Act, a pharmaceutical manufacturer seeking expedited FDA approval to market a generic version of a patented drug may sub-

mit an ANDA. 21 U.S.C. § 355(j). An applicant submitting an ANDA must certify one of four things: (1) that the drug for which the ANDA is submitted has not been patented (a "paragraph I" certification); (2) that any patent on such drug has expired (a "paragraph II" certification); (3) the date on which the patent on such drug will expire, if it has not yet expired (a "paragraph III" certification); or (4) that the patent on such drug "is invalid or that it will not be infringed by the manufacture, use, or sale of the new drug" for which the ANDA is submitted (a "paragraph IV" certification). 21 U.S.C. § 355(j)(2)(A)(vii)(I)–(IV). When an applicant submits an ANDA that contains a paragraph IV certification, it must give the owner of the relevant patent notice of the certification. 21 U.S.C. § 355(j)(2)(B).

The Hatch–Waxman Act provides generally that "[i]t shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs." 35 U.S.C.A. § 271(e)(1). Inclusion of a paragraph IV certification in an ANDA, however, is deemed an act of infringement. The statute, referring to an ANDA containing a paragraph IV certification, states: "It shall be an act of infringement" to submit an application under 21 U.S.C. § 355(j) "for a drug claimed in a patent ... if the purpose of such submission is to obtain approval ... to engage in the commercial manufacture, use, or sale of [the] drug ... before the expiration of [the] patent." 35 U.S.C.A. § 271(e)(2)(A).

If an ANDA contains a paragraph I or a paragraph II certification, and all applicable scientific and regulatory requirements have been met, FDA approval of the ANDA is effective immediately. 21 U.S.C. § 355(j)(4)(A), (B)(i). If the ANDA contains a paragraph III certification, and all applicable scientific and regulatory requirements have been met, approval is effective on the patent expiration date stated in the certification. 21 U.S.C. § 355(j)(4)(A), (B)(ii).

If the ANDA contains a paragraph IV certification, and all applicable scientific and regulatory requirements have been met, ap-

proval of the ANDA "shall be made effective immediately" unless the patent owner brings an action for infringement under 35 U.S.C.A. § 271(e)(2)(A) within forty-five days of receiving the notice required by 21 U.S.C. § 355(j)(2)(B). 21 U.S.C. § 355(j)(4)(B)(iii). The Hatch–Waxman Act further provides that, when a patent owner brings a section 271(e)(2)(A) infringement action, the FDA must suspend approval of the ANDA. *Id.* The suspension continues—and the FDA cannot approve the ANDA—until the earliest of three dates: (i) if the court decides that the patent is invalid or not infringed, the date of the court's decision; (ii) if the court decides that the patent has been infringed, the date that the patent expires; or (iii) subject to modification by the court, the date that is thirty months from the patent owner's receipt of notice of the filing of the paragraph IV certification. 21 U.S.C. § 355(j)(4)(B)(iii)(I)–(III); 35 U.S.C.A. 271(e)(4)(A).

Thus, the Hatch–Waxman Act strikes a balance between the interests of a party seeking approval of an ANDA and the owner of a drug patent. On the one hand, the manufacture, use, or sale of a patented drug is not an act of infringement, to the extent it is necessary for the preparation and submission of an ANDA. On the other hand, once it is clear that a party seeking approval of an ANDA wants to market a patented drug prior to the expiration of the patent, the patent owner can seek to prevent approval of the ANDA by bringing a patent infringement suit. While it is pending, such a suit can have the effect of barring ANDA approval for two and a half years.

**B.** *The URAA*

President Clinton signed the URAA on December 8, 1994, implementing the participation of the United States in the General Agreement on Tariffs and Trade. Section 532(c) of the URAA is the provision of the act that is applicable to this case. It provides as follows:

(c) *Continuation.—*

(1) *Determination.—*The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20–year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers.[1]

(2) *Remedies.—*The remedies of sections 283, 284, and 285 of this title shall not apply to Acts which—

(A) were commenced or for which substantial investment was made before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act; and

(B) became infringing by reason of paragraph (1).

(3) *Remuneration.—*The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)) of this title.

35 U.S.C.A. § 154(c). Thus, the URAA creates a limited safe harbor for persons who commenced particular acts, or made substantial investment toward commission of those acts before June 8, 1995 (the date six months after the URAA was enacted), which acts became infringing because of the extension of the patent period by the URAA. Under the URAA's safe harbor provision, a patent owner may not assert the traditional remedies of 35 U.S.C. §§ 283, 284, and 285 (1988) for qualifying acts of infringement committed during the period of a patent's extension (the "Delta" period). *See* 35 U.S.C.A. § 154(c)(2). The patent owner is entitled to an equitable remuneration, however, for such acts. *See* 35 U.S.C.A. § 154(c)(3).

**1.** Subsection (a)(2) of the URAA provides that the term of a patent
    shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the

application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c) of ... title [35], from the date on which the earliest such application was filed.
    35 U.S.C.A. § 154(a)(2) (West Supp.1995).

## II.

### A. *Royce's ANDA*

As noted above, the '776 patent claims the drug captopril. Captopril, which is commercially marketed under the trademark "Capoten," is used to treat hypertension, heart failure, diabetic nephropathy (kidney disease resulting from diabetes), and left ventricular dysfunction following myocardial infarction. When it was first issued, the expiration date of the '776 patent was August 8, 1995. The URAA, however, extended the term of the patent to February 13, 1996.

Royce planned to begin selling a generic version of captopril after the August 8, 1995 expiration date of the '776 patent. In anticipation of this, it submitted an ANDA to the FDA on June 26, 1994. In its ANDA, Royce included a paragraph III certification stating that the '776 patent would expire on August 8, 1995. After the URAA went into effect, however, the FDA, in a response to a citizen petition, ruled that paragraph IV certifications should be submitted for all generic drugs sought to be sold after the original patent expiration date and before the extended expiration date (*i.e.*, during the Delta period). Royce amended its ANDA to include a paragraph IV certification.

In its paragraph IV certification, Royce did not state that the '776 patent was invalid or that the claims of the patent did not cover Royce's generic captopril. Rather, Royce stated that by manufacturing, using, or selling generic captopril during the Delta period, it would not infringe the '776 patent because it would be operating under the safe harbor of the URAA, meaning the provision of the URAA precluding the remedies of 35 U.S.C. §§ 283–85. *Bristol–Myers Squibb Co.*, No. 95–1682–CIV–DAVIS, slip op. at 5. Upon amending its ANDA to include the paragraph IV certification, Royce gave Bristol the notice required by the Hatch–Waxman Act. *See* 21 U.S.C. § 355(j)(2)(B).

### B. *Proceedings in the District Court*

In due course, after receiving Royce's notice, Bristol brought its action in the district court, charging Royce with patent infringement under 35 U.S.C.A. § 271(e)(2)(A). Bristol alleged that Royce had infringed the '776 patent by submitting an ANDA seeking FDA approval to market a generic version of captopril before the expiration of the patent. In view of the fact that Royce neither had challenged the validity of the '776 patent nor had claimed that its generic version of captopril was not covered by the claims of the patent, Bristol asked the district court to enter an order pursuant to 35 U.S.C.A. § 271(e)(4)(A) that the effective date of approval of Royce's ANDA be no earlier than the February 13, 1996 expiration date of the '776 patent. Shortly after Bristol filed its complaint, Royce moved for an order dismissing the complaint and dissolving the statutory bar against FDA approval of Royce's ANDA. Royce also asked the court to make its ANDA effective immediately.[2]

In addressing Royce's motion, the district court noted that infringement under 35 U.S.C. § 271(e)(2), through the filing of a paragraph IV certification, is a "somewhat artificial" form of infringement created by the Hatch–Waxman Act. *Bristol–Myers Squibb Co.*, No. 95–1682–CIV–DAVIS, slip op. at 4. Thus, the court posited that the question before it was not "whether Royce's *application* to use the drug infringes the patent, but rather whether its *manufacture, use,* [or] *sale* of the drug infringes the '776 patent." *Id.* at 6. The court continued by stating that "if the paragraph IV certification is subsequently found by the district court to be correct in that the applicant's use of the drug after FDA approval will not infringe the patent, then there is no longer any 'artificial infringement' of the patent and the patentee has no actionable claim against the ANDA applicant." *Id.* at 7. The court concluded that Congress's objective in creating section 271 "was to strike a 'careful balance between

---

**2.** Royce's filing was styled an "Emergency Motion to Set Aside Injunction and Dismiss Complaint." There was, of course, no injunction in effect. The "injunction" to which Royce was referring was the Hatch–Waxman Act prohibition against approval of Royce's ANDA, which came into effect upon the filing of Bristol's lawsuit. *See* 21 U.S.C. § 355(j)(4)(B)(iii). We believe it more accurate to refer to the "statutory bar" that came into effect when Bristol filed its lawsuit, rather than to speak in terms of an injunction.

the policies of fostering the availability of generic drugs and of providing sufficient incentives for research on breakthrough drugs.'" *Id.* at 9 (citing Abbreviated New Drug Application Regulations, 59 Fed.Reg. 50,338 (1994)). The court then stated:

> The only reading of the URAA and the Hatch–Waxman Act that maintains this compromise is that the [URAA] provides the patentees an extended patent term in exchange for allowing the new drug companies to use the patented drug in an otherwise infringing manner as long as they pay equitable remuneration to the patentees for the commercial use. Under this reading of the governing statutes and treaties, Royce's manufacture, use, or sale of the drug within the "safe harbor" provision of the URAA would not infringe the '776 patent.

*Id.* at 10.

Based upon this reasoning, the court determined that Royce's "paragraph IV certification stating noninfringement is not in error and no longer constitutes an actionable infringement under section 271." *Id.* Accordingly, the court ruled that, since "there would be no infringing activity by Royce after FDA approval," there was no longer any need to prohibit approval, and therefore Bristol's amended complaint failed to state a claim upon which relief could be granted. *Id.* at 11.[3]

## DISCUSSION

### I.

■ Whether the district court properly granted Royce's motion to dismiss is a question of law that we review *de novo. Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1170 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995). In conducting that review, we deem the facts in the complaint to be correct. *United States v. Cocoa Berkau, Inc.,* 990 F.2d 610, 612 (Fed.

Cir.1993). In any event, the facts of this case are not in dispute. The issue before us is one of statutory construction, a question of law that we review *de novo. Romero v. United States,* 38 F.3d 1204, 1207 (Fed.Cir. 1994).

■ On appeal, Bristol argues that the district court erred in concluding that the manufacture, use, or sale of Royce's generic version of captopril before February 13, 1996, would not infringe the '776 patent because of the safe harbor provision of the URAA. Bristol contends that the safe harbor provision does not permit infringement by Royce during the Delta period and that, therefore, as mandated by the Hatch–Waxman Act, the effective date of FDA approval of Royce's ANDA may not be earlier than February 13, 1996. For its part, Royce responds that we should affirm, because the district court correctly determined that the URAA permits the manufacture, use, and sale of generic captopril during the Delta period. Accordingly, Royce's paragraph IV certification to the effect that such conduct would not be infringing during the Delta period was correct. Consequently, the certification did not amount to an act of infringement under 35 U.S.C.A. § 271(e)(2)(A) so as to entitle Bristol to the remedies of 21 U.S.C. § 355(j)(4)(B)(iii) and 35 U.S.C.A. § 271(e)(4).

We agree with Bristol. For the reasons set forth below, we hold that the safe harbor provision of the URAA does not permit Royce to make, use, or sell generic captopril during the Delta period. Thus, the statutory bar against FDA approval of Royce's ANDA prior to February 13, 1996 remains in effect. The district court erred in granting Royce's motion to dismiss and in setting aside the bar.

### II.

We begin our analysis by considering what the result would be if Royce had filed its

---

**3.** The court declined, however, to direct the FDA to approve Royce's ANDA. In the United States Court of Appeals for the Eleventh Circuit, Royce has filed what it calls a "Petition for Review of Agency Refusal to Issue Approval of Abbreviated New Drug Application." *See In re Royce Labora-*

*tories, Inc. v. Food and Drug Administration,* Case No. 95–5094. In that appeal, Royce argues that the FDA acted improperly by failing to make approval of Royce's ANDA effective on August 24, 1995, the date of the district court's decision in this case.

paragraph IV certification in the absence of the safe harbor provision of the URAA. This approach brings into sharp focus the question of whether, as the district court held, the safe harbor provision allows Royce to sell its generic version of captopril during the Delta period and therefore makes such sale noninfringing, thereby barring the remedies of the Hatch–Waxman Act that normally would apply.

As seen above, the Hatch–Waxman Act gives a drug patent owner the right to bring an action for infringement upon the filing of a paragraph IV certification. 35 U.S.C.A. § 271(e)(2)(A). In that action, depending upon the nature of the certification that has been filed, the district court determines the validity of the patent at issue and/or whether the drug sought to be marketed infringes the claims of that patent. "What is achieved by § 271(e)(2) [is] the creation of a highly artificial act of infringement that consists of submitting an ANDA ... containing a [paragraph IV] certification that is in error as to whether commercial manufacture, use, or sale of the new drug (none of which, of course, has actually occurred) violates the relevant patent." *Eli Lilly and Co. v. Medtronic, Inc.,* 496 U.S. 661, 678, 110 S.Ct. 2683, 2692–93, 110 L.Ed.2d 605 (1990). Thus, section 271(e)(2)(A) makes it possible for a patent owner to have the court determine whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent. If the court determines that the patent is not invalid and that infringement *would* occur, and that therefore the ANDA applicant's paragraph IV certification is incorrect, the patent owner is entitled to an order that FDA approval of the ANDA containing the paragraph IV certification not be effective until the patent expires. *See* 21 U.S.C. § 355(j)(4)(B)(iii)(II); 35 U.S.C.A. § 271(e)(4)(A). In addition, the act suspends FDA approval while the infringement suit is pending. *See* 21 U.S.C. § 355(j)(4)(B)(iii).

In this case, it is undisputed that the URAA extended the term of the '776 patent to February 13, 1996. It also is clear that, by amending its ANDA to include a paragraph IV certification, Royce committed an act of infringement under the Hatch–Wax-man Act because it sought "to obtain approval ... to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent ... before the expiration of such patent." 35 U.S.C.A. § 271(e)(2)(A). Finally, it is undisputed that in its paragraph IV certification Royce did not allege either that the '776 patent was invalid or that its generic captopril was not covered by the claims of the patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

Plainly, on these facts, there can be no question that if the district court had not had before it the safe harbor provision of the URAA, it would have been compelled to deny Royce's motion. Since Royce did not challenge the validity of the '776 patent and did not contend that its generic version of captopril was not covered by the claims of the patent, it is clear that if it marketed its product before February 13, 1996, it would be an infringer. Thus, its paragraph IV certification asserting noninfringement during the Delta period would have been incorrect. Under these circumstances, the district court would have had no alternative but to grant Bristol the relief it sought: an order that the effective date of any FDA approval of Royce's ANDA not be earlier than February 13, 1996. We turn now to the question of whether the URAA changes this outcome.

As noted above, Royce contends that distribution of its generic version of captopril during the Delta period would not constitute infringement of the '776 patent. It bases this contention on the same reasoning that the district court used: the URAA authorizes the sale of products that are covered by the claims of a valid patent. Royce argues that such an "authorized" sale cannot constitute infringement. Put another way, Royce claims that when the URAA says that particular conduct "may continue," it means that the conduct is not infringement. Consequently, Royce asserts, its paragraph IV certification was correct. Therefore, the Hatch–Waxman Act does not bar approval of its ANDA. We reject this reasoning because it is not supported by the language of the statute.

The pertinent portion of the URAA reads as follows: [4]

(2) *Remedies.*—The remedies of sections 283, 284, and 285 of this title shall not apply to Acts which—

(A) were commenced or for which substantial investment was made before the date that is six months after the date of the enactment of the Uruguay Round Agreements Act; and

(B) became infringing by reason of [the extension of the term of the patent].

(3) *Remuneration.*—The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)) of this title.

35 U.S.C.A. § 154(c).

Contrary to Royce's argument and the holding of the district court, we do not believe that the URAA makes infringing conduct non-infringing during the Delta period. It merely provides that infringing conduct will not give rise to the entire panoply of traditional statutory remedies for patent infringement. Such conduct will give rise only to the limited remedy of equitable remuneration. For us, what compels the conclusion that the URAA does not absolve infringing conduct from being denominated "infringement" during the Delta period is the statutory scheme that the URAA establishes.

By its terms, the URAA applies to "Acts which ... became infringing" because of the extension of the patent term. The statute then provides that those acts, *i.e.*, acts that became infringing, do not give rise to the remedies of 35 U.S.C. §§ 283, 284, and 285. Such acts may be continued upon the payment of equitable remuneration in an amount determined in an action brought under chapter 28 or chapter 29 of title 35. Chapters 28 and 29 authorize and govern the bringing of actions for infringement. Thus, the design of the URAA is to provide for a patent term extension that renders covered conduct in-

fringing, but then to provide a limited remedy for that kind of infringement, through an action for relief for infringement in the form of equitable remuneration. The statutory scheme does not say, as Royce argues and as the district court held, "If normally you would infringe, you do not infringe during the Delta period." Rather, it says, "If normally you would infringe, you also infringe during the Delta period. The difference is that, for infringement during the Delta period, you are not subject to the traditional remedies for patent infringement. Instead, you pay the patent owner an equitable remuneration." We are unable to escape the conclusion that if Congress had intended the result urged by Royce—having the URAA convert infringing conduct into non-infringing conduct during the Delta period—it would not have established the statutory scheme just described, which points in a different direction. *See United States v. International Business Machs. Corp.*, 892 F.2d 1006, 1009 (Fed.Cir.1989) ("Had Congress intended to make the exemptions permanent, it knew how: it could and we believe would have used words of futurity.").

The URAA makes no mention of the provisions of the Hatch–Waxman Act. Yet, as the Supreme Court stated in *Eli Lilly and Co. v. Medtronic, Inc.*, the Hatch–Waxman Act created "an important new mechanism designed to guard against infringement of patents relating to pioneer drugs," with enforcement provisions that "apply only to drugs and not to other products." 496 U.S. at 676–77, 110 S.Ct. at 2691–92. The Act's "mechanism" includes provisions (i) stating that the submission of a paragraph IV certification is "an act of infringement," 35 U.S.C.A. § 271(e)(2)(A), and (ii) setting forth the remedies that are available when a patent owner brings an action based upon such "an act of infringement." *See* 21 U.S.C. § 355(j)(4)(B)(iii), 35 U.S.C.A. § 271(e)(4). We presume "that Congress is knowledgeable about existing law pertinent to legislation it enacts." *VE Holding Corp. v. John-*

---

**4.** The parties have not pointed to, and we have not discovered, any legislative history on the intent of Congress, at the time of passage of the URAA, regarding the interplay between the URAA and the Hatch–Waxman Act. Therefore, we limit our inquiry to the wording of the statute.

*son Gas Appliance Co.,* 917 F.2d 1574, 1581 (Fed.Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). We believe that if Congress had intended that the URAA affect the Hatch–Waxman Act's finely crafted ANDA approval process in the manner urged by Royce, at the very least it would have referred to 21 U.S.C. § 355(j) and 35 U.S.C.A. § 271(e) in the URAA. *See United States v. International Business Machs. Corp.,* 892 F.2d at 1009.

The foregoing analysis is consistent with our recent decision in *DuPont Merck Pharmaceutical Co. v. Bristol–Myers Squibb Co.,* 62 F.3d 1397, 35 USPQ2d 1718 (Fed.Cir. 1995). That case also involved issues arising out of the extension of the term of the '776 patent as a result of the URAA. The appellants in that case were DuPont Merck Pharmaceutical Company, Endo Laboratories, L.L.C., and Mylan Pharmaceuticals Inc. Like Royce, they filed ANDAs seeking FDA approval for the marketing of a generic version of captopril after August 8, 1995. Unlike Royce, however, they chose not to amend their ANDAs to include paragraph IV certifications, as directed by the FDA. Instead, they filed a declaratory judgment action in the United States District Court for the District of Delaware in which, among other things, they sought the following relief: "a declaration that, as long as they pay Bristol–Myers [an] equitable remuneration, they will have authority to make, use, and sell their captopril products after August 8, 1995, and therefore, will not infringe the '776 patent." The district court granted Bristol–Myers's motion to dismiss on the ground that, because the plaintiffs had not filed a paragraph IV certification, no actual controversy existed as required by the Declaratory Judgments Act, 28 U.S.C. § 2201 (1988). An appeal to this court followed.

After determining that the district court did in fact have jurisdiction because there was an actual controversy between the parties, we turned to the merits of "the legal relation between section 154(c) of the URAA and the statutory scheme governing FDA approval of ANDAs, *see* 21 U.S.C. § 355(j), 35 U.S.C.A. § 271(e)." *DuPont Merck Pharmaceutical Co.,* 62 F.3d at 1401, 35 USPQ2d

at 1722. We stated that "[b]ecause this issue is purely legal and was fully briefed to the district court, in the interests of economy, this court will decide on the merits whether the law entitles DuPont Merck/Endo and Mylan to relief." *Id.,* 62 F.3d at 1401, 35 USPQ2d at 1722. We then stated:

> DuPont Merck/Endo and Mylan want to market their generic captopril products before February 13, 1996—the date of expiration of Bristol's '776 patent. Thus, should they file amended ANDAs, they will commit infringement under section 271(e)(2).
>
> The only remaining question is whether the URAA converts this otherwise infringing activity during the Delta period to noninfringing activity. Section 154(c) of the URAA exempts qualifying persons who infringe during the Delta period from certain remedies for infringement. Section 154, however, does not authorize infringement. Infringement under section 271(e)(2) before passage of the URAA continues to be infringement after passage of the URAA.
>
> The URAA has no effect, moreover, on the provisions in section 355(j)(4)(B)(iii) triggered by the filing of an infringement suit. Once a patentee files an infringement suit under section 271(e)(2), FDA will suspend its approval of the ANDA. *See* 21 U.S.C. § 355(j)(4)(B)(iii). The patentee may then litigate its infringement suit as aggressively as permitted by law.
>
> In sum, the URAA, by its terms, exempts a qualified infringer from the remedies of sections 283, 284, and 285 of Title 35. The URAA, however, works no change on the definition of infringement under section 271(e)(2) and has no [effect] on the statutory provisions relating to FDA approval of ANDAs that are triggered by that act of infringement. *See* 21 U.S.C. § 355(j).

*Id.,* 62 F.3d at 1402, 35 USPQ2d at 1722.

We hold that the URAA does not convert Royce's sale of generic captopril during the Delta period into a non-infringing activity. Thus, Royce's paragraph IV certification to the contrary is incorrect. This means that Bristol is entitled to the Hatch–Waxman Act

remedy that is "triggered" by the filing of an incorrect paragraph IV certification. That remedy is an order from the district court that the effective date of any approval of Royce's ANDA be not earlier than February 13, 1996, the expiration date of the '776 patent. *See* 35 U.S.C.A. § 271(e)(4)(A). That is precisely the remedy that Bristol sought in the district court. For this reason, the district court should not have dismissed Bristol's suit and should not have set aside the statutory bar against FDA approval of Royce's ANDA.[5]

## CONCLUSION

For the foregoing reasons, the district court erred (1) in granting Royce's motion to dismiss Bristol's suit and (2) in setting aside the statutory bar against FDA approval of Royce's ANDA. Accordingly, the judgment in favor of Royce is reversed. The case is remanded to the district court, which is instructed to reinstate both Bristol's amended complaint and the statutory bar against FDA approval of Royce's ANDA.

## COSTS

Each party shall bear its own costs.

REVERSED and REMANDED with INSTRUCTIONS.

---

**5.** The result would be no different even if, in its paragraph IV certification, Royce had challenged the validity of the '776 patent or had claimed that its product was not covered by the claims of the patent. As we have seen, one of the remedies "triggered" by the filing of a paragraph IV certification is that FDA approval of an ANDA is suspended until any Hatch–Waxman Act infringement suit is resolved. *See* 21 U.S.C. § 355(j)(4)(B)(iii).