HOECHST AKTIENGESELLSCHAFT, Plaintiff–Appellant,

v.

Donald J. QUIGG, Assistant Secretary of Commerce and Commissioner of Patents & Trademarks, Defendant–Appellee.

No. 90–1088.

United States Court of Appeals, Federal Circuit.

Oct. 16, 1990.

Basil J. Lewris, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., argued, for plaintiff-appellant. With him on the brief were Jerry D. Voight, J. Michael Jakes and David S. Forman. Also on the brief was Jerome Rosenstock, Hoechst Celanese Corp., Somerville, N.J., of counsel.

Fred E. McKelvey, Sol., Office of the Sol., Arlington, Va., argued, for defendant-appellee. With him on the brief was Teddy S. Gron, Asst. Sol.

Before MICHEL, Circuit Judge, BALDWIN, Senior Circuit Judge, and WILLIAMS, Senior District Judge.*

BALDWIN, Senior Circuit Judge.

Hoechst Aktiengesellschaft ("Hoechst") appeals the decision of the United States District Court for the Eastern District of Virginia, *Hoechst Aktiengesellschaft v. Quigg*, 724 F.Supp. 398, 13 USPQ2d 1543 (E.D.Va.1989), upholding upon motion for summary judgment, a ruling by the Commissioner of Patents and Trademarks, Donald J. Quigg ("Commissioner"), that U.S. Patent No. 3,737,433 ('433) is not entitled to an extension of its term under 35 U.S.C. § 156. We reverse and remand.

BACKGROUND

Hoechst owns the '433 patent claiming pentoxifylline, a pharmaceutical product for human use having the tradename Trental. The '433 patent issued on June 5, 1973 but the Food and Drug Administration ("FDA") did not approve Trental for commercial marketing until August 30, 1984. Thus, more than ten years elapsed between the time the '433 patent issued and the date Trental could be marketed.

Hoechst applied for a patent term extension under 35 U.S.C. § 156 on October 29, 1984. The U.S. Patent and Trademark Office ("PTO") determined that Hoechst was not entitled to a term extension for the '433 patent because Trental had not been subject to a regulatory review period within the meaning of Section 156(a)(4) and the Commissioner denied Hoechst's request for reconsideration. *In re Hoechst Aktiengesellschaft*, 227 USPQ 638 (Comm'r Pat. 1985).

Hoechst appealed the Commissioner's decision to the United States District Court for the Eastern District of Virginia and the parties submitted cross-motions for summary judgment. The district court determined that the language of Section 156 was ambiguous, consulted the legislative history and concluded that the '433 patent did not fall within the group of patents Congress intended to be eligible for patent extensions. It granted the Commissioner's motion for summary judgment and this appeal by Hoechst followed.

ISSUE

Did the district court err in determining that the '433 patent was ineligible for a term extension?

OPINION

I.

A. Eligibility Requirements for a Patent Term Extension

The eligibility requirements for a patent term extension, as set forth in 35 U.S.C.

* The Honorable Spencer M. Williams, Senior District Judge, United States District Court for the Northern District of California, sitting by designation.

§ 156(a)[1], are as follows:

### § 156. Extension of patent term

(a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent if-

(1) the term of the patent has not expired before an application is submitted under subsection (d) for its extension;

(2) the term of the patent has never been extended;

(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of subsection (d);

(4) the product has been subject to *a regulatory review period* before its commercial marketing or use;

(5)(A) except as provided in subparagraph (B) [concerning recombinant DNA technology] or (C) [concerning new animal drugs and veterinary biological products], the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred;.... (emphasis added).

Section 156(d)(1) further states that in order to obtain an extension, the patent owner must submit an application "within the sixty-day period beginning on the date the product received permission under the provision of law under which the applicable regulatory review period occurred for commercial marketing or use."

According to the record, Hoechst has satisfied all of the requirements for a patent term extension under Section 156(a)(1)–(3) and (a)(5). It is also clear that Hoechst applied for the extension within 60 days after Trental received FDA approval, pursuant to Section 156(d)(1). The only question is whether Trental has undergone a "regulatory review period" pursuant to Section 156(a)(4).

### B. Regulatory Review Period

The "regulatory review period" for a human drug such as Trental is defined in Section 156(g)(1) as follows:

(g) For purposes of this section, the term "regulatory review period" has the following meanings:

(1)(A) In the case of a product which is a new drug, ... the term means the period described in subparagraph (B) *to which the limitation described in paragraph (6) applies.* (emphasis added)

Subparagraph (B)[2] essentially provides that the length of the regulatory review period is the sum of (i) the testing phase period and (ii) the approval phase period for the drug. It is undisputed that the formula in subparagraph (B) yields a 9.5 year regulatory review period which is then reduced by Section 156(c)[3] to yield a 6.8 year term extension for the Trental patent. The primary dispute in this case concerns the meaning and effect of the emphasized language in Section 156(g)(1)(A) "to which the limitation described in paragraph (6) applies."

---

**1.** Section 156 codifies Title II, § 201 of the Drug Price Competition and Patent Term Restoration Act of 1984 ("Act"), Pub.L. 98–417, 98 Stat. 1585 (1984), as amended by the Generic Animal Drug and Patent Term Restoration Act, Pub.L. 100–670, 102 Stat. 3971 (1988).

**2.** Section 156(g)(1)(B) states:

(B) The regulatory review period for a new drug ... is the sum of—

(i) the period beginning on the date an exemption under subsection (i) of section 505 or subsection (d) of section 507 became effective for the approved product and ending on the

date an application was initially submitted for such drug product under section 351, 505, or 507, and

(ii) the period beginning on the date the application was initially submitted for the approved product under section 351, subsection (b) of section 505, or section 507 and ending on the date such application was approved under such section.

**3.** Section 156(c) essentially states that the extension period which is equal to the regulatory review period, may be reduced in four different circumstances.

## C. The Limitations of Paragraph (6)

Section 156(g)(6) provides, in relevant part:

(6) A period determined under any of the preceding paragraphs is subject to the following limitations:

(A) If the patent involved was issued after the date of enactment of this section, the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

(B) If the patent involved was issued before the date of the enactment of the section and—

(i) no request for an exemption described in (1)(B) ... was submitted,

. . . .

before such date for the approved product the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

(C) If the patent involved was issued before the date of the enactment of this section and if an action described in subparagraph (B) was taken before the date of the enactment of this section with respect to the approved product and the commercial marketing or use of the product has not been approved before such date, the period of extension determined on the basis of the regulatory review period determined under such paragraph may not exceed two years....

None of the limitations in Section 156(g)(6) applies to the '433 patent. For instance, subparagraph (A), which limits the maximum term extension to five years for a patent which issues after the date of enactment of the Act, September 24, 1984, is inapplicable because the '433 patent issued prior to that date. Subparagraph (B), which limits the maximum extension to five years for patents that issued prior to the date of enactment, but for which no exemption had been applied for as of that date, is inapplicable because Hoechst applied for an exemption prior to the date of enactment. Subparagraph (C), which limits the maximum extension to two years for patents that issued before the date of enactment if the regulatory review period had commenced but commercial marketing or use had not yet been approved at the time of enactment, is inapplicable because Trental had already received such approval at the time of enactment.

## II.

The Commissioner argues here as he did below that the language "to which the limitation described in paragraph (6) applies" in Section 156(g)(1)(A) incorporates the paragraph (6) limitations into the definition of a regulatory review period. Thus, if none of the limitations in paragraph (6) applies, no regulatory review period is established and no patent term extension is available. In support of this interpretation, the Commissioner notes the rule of statutory construction requiring the court to give effect to all portions of a statute and to avoid constructions rendering any language superfluous. He further relies upon legislative history indicating that Congress intended that no patent for a drug be given a term extension greater than five years and argues that any alternative interpretation would conflict with that intention.

Hoechst argues that a plain reading of the statute shows that the requirements of paragraph (6) are not a part of the definition of a regulatory review period and are thus not a part of the statute's eligibility requirements. Rather, according to Hoechst, the paragraph (6) limitations are caps on the length of a term extension for a patent which has already been determined to be eligible for an extension pursuant to Sections 156(a) and (g)(1)(B). It further argues that Congress's failure to place a cap on the length of term extensions for the Trental patent and the small number of other drug patents which received FDA approval shortly before the Act's passage, was simply an oversight.

In response to these same arguments, the district court said that although the Commissioner's and Hoechst's interpretations were both plausible, neither was ultimately convincing. It consequently sought

clarification in the Act's legislative history. *Hoechst*, 724 F.Supp. at 401–02, 13 USPQ2d at 1546–47.

Specifically, the court noted the purpose of the Act: to compensate drug patent owners who lost part of their patent term due to the protracted FDA approval process and thereby provide incentive for the pharmaceutical industry to develop new drugs. It also determined, however, that the focus of the Act was narrow, so as also to recognize the needs of the generic drug industry. *Id.* at 402, 13 USPQ2d at 1546. It then concluded that statements in various House Reports that no period of extension under the Act could exceed five years, reflect a compromise intended to accommodate the competing interests of the generic pharmaceutical and research-based pharmaceutical industries. *Id.*

The court also said that the structure of the Act promoted this compromise by providing a greater incentive to future innovators. Specifically, it said that under paragraph (6), the longest term extensions were reserved for the products farthest from commercial marketing, i.e., those not yet patented at the time of the Act's enactment and those which were patented but which had not yet begun the regulatory review process at the time of enactment. *Hoechst*, 724 F.Supp. at 403, 13 USPQ2d at 1547. It concluded that given Congress's explicit intention to restrict maximum term extensions to five years, and the statute's structure which clearly supports such intention, it would be anomalous to extend the Trental patent for 6.8 years. Thus, it held that the '433 patent was not entitled to any patent term extension. *Id.*

### III.

This court must decide the same question of law presented below. Because that question is one of statutory interpretation, we need not defer to the district court's analysis and conclusions. *See Glaxo Operations UK Limited v. Quigg*, 894 F.2d 392, 395, 13 USPQ2d 1628, 1630 (Fed.Cir.1990).

While the agency's interpretation of a statute it administers is entitled to deference, *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), "the courts are the final authority on the issues of statutory construction. They must reject administrative constructions, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy Congress sought to implement." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1425, 7 USPQ2d 1152, 1154 (Fed.Cir.1988) (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)).

■ Therefore, "if a court, employing the traditional tools of statutory construction, ascertains that the Congress had an intention on the precise question at issue, the intention is the law and must be given effect." *Chevron U.S.A.*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781–82 at n. 9. Since this court must reject administrative constructions of the statute that are inconsistent with the statutory mandate, we give no deference to the agency's interpretations and conclusions.

### IV.

■ It is well settled law that the plain and unambiguous meaning of the words used by Congress prevails in the absence of a clearly expressed legislative intent to the contrary. *See Mansell v. Mansell*, 490 U.S. 581, ——, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989); *LSI Computer Sys. v. United States Int'l Trade Comm'n*, 832 F.2d 588, 590 (Fed.Cir.1987). As the district court observed, however, the Commissioner and Hoechst each have plausible interpretations of the statutory language and "there is sufficient ambiguity in that language to accommodate and bear the weight of both positions." *Hoechst*, 724 F.Supp at 401. When faced with such ambiguity it is incumbent upon this court to examine the legislative history to discern Congress' intent.

### V.

■ Nowhere in the extensive legislative history of the Act does Congress explicitly

exclude patents for drugs which were approved just prior to enactment of the Act. However, legislative history clearly indicates that Congress did not want any extension to be greater than five years [4], and discussions in a House subcommittee hearing report suggest why some patents should be entitled to less than a five year extension [5]. The Commissioner and the district court consider such references to the length of a term extension to be suggestive of Congress's intention not to include the Trental patent among those eligible for an extension. We disagree. Such evidence is of little or no help in ascertaining whether Congress intended the Trental patent and those similarly situated patents for drugs approved shortly before enactment of the Act, to be eligible for a term extension. The legislative history is silent on this issue.

The legislative history is not silent, however, with regard to whether Congress meant Section 156(g)(6) to be part of the definition of "regulatory review period." In one House Report, the Subcommittee said:

Under section 156(c), the length of the extension is based on the length of the regulatory review period in which the approved product was approved. *The definition of the various regulatory review periods is in sections 156(g)(1)–(3).* All regulatory review periods are divided into a testing phase and an agency approval phase.

The regulatory review period which occurs after the patent to be extended was issued is eligible to be counted towards extension in accordance with the following calculation. First, each phase of the regulatory review period is reduced by any time that the applicant for extension did not act with due diligence during that phase. (The determination of lack of due diligence is made under section 156(d).) Second, after any such reduction, one-half of the time remaining in the testing phase would be added to the time remaining in the approval phase to comprise the total period eligible for extension. Third, all of the eligible period can be counted unless to do so would result in a total remaining patent term of more than fourteen years. For example, if any approved drug product which is eligible for five years of extension had ten years of original patent term left at the end of its regulatory period, then only four of the five years could be counted towards extension.

*The additional limitation on the period of extension is found in section 156(g)(4) [now section 156(g)(6)].* That section provides different maximum periods of extension depending on whether the approved product was developed before or after the date of enactment.

House Report I at 40, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 2673 (emphases added).

It is clear from the above House Report that Congress intended Sections 156(g)(1)–(3) [the 1988 amendments added Sections 156(g)(4)–(5)] to define the "regulatory review period" and for Section 156(g)(6) to be a limitation on the extension term. Legislative history explicitly indicating that no patent term extension be greater than five years has no bearing on how Congress intended to define a regulatory review period under the Act. Whether a drug has undergone a regulatory review period and the related patent is eligible for a term extension and how that extension should be limited are two completely different issues.

Thus, we conclude that subparagraph (B) describes the regulatory review period and paragraph (6) describes the limitation which applies to that regulatory review period. Thus, the phrase "to which the limitation described in paragraph (6) applies" is not superfluous, but is merely an internal

---

4. H.R.Rep. No. 857, 98th Cong., 2d Sess., p. 1, at 15, *reprinted in* 1984 U.S.Code Cong. & Admin. News 2647, 2648. ("House Report I").

H.R.Rep. No. 857, 98th Cong., 2d Sess., p. 2, at 6, *reprinted in* 1984 U.S.Code Cong. & Admin. News 2686, 2690. ("House Report II").

5. *See Innovation and Patent Law Reform: Hearings on H.R. 3285, H.R. 3286, and H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House of Representatives Comm. on the Judiciary,* 98th Cong., 2d Sess. 406–07 (1984).

cross-reference. Indeed, the existence of similar cross-references in paragraphs (g)(2)(A), (3)(A), (4)(A) and (5)(A) together with the reference back to these paragraphs that appears in paragraphs (6)(A), (B) and (C) supports this interpretation. The preamble to paragraph (6) states that "[a] period *determined* under any of the preceding paragraphs is subject to the following limitations...." (emphasis added). Similarly, each of subparagraphs (A), (B) and (C), which describes a different specific term extension limitation, also refers to a regulatory review period which has been "determined under any such [preceding] paragraph." These cross-references clearly and repetitively suggest that the limitation is applicable to a *previously* established regulatory review period. Thus, we reject the Commissioner's argument that the phrase "to which the limitation described in paragraph (6) applies" is equivalent to "[a] regulatory review period within the meaning of § 156(a)(4) and § 156(g)(1) has occurred *if* the limitation of paragraph (6) applies". Commissioner's Brief at 9 (emphasis added).

## VI.

■ In granting summary judgment for the Commissioner, the district court never explicitly accepted the Commissioner's interpretation of the term "regulatory review period." Rather, the district court arrived at its conclusion that the '433 patent was not entitled to a term extension by focusing on the structure of the part of the Act regarding term extension limitations and the related legislative history. Specifically, the district court assumed that the statutory scheme was a progression of decreasing patent term extensions consisting of five years for products which had not started FDA review prior to enactment; two years for products which had started FDA review but had not yet received approval as of the date of enactment; and zero years for products which had received FDA approval prior to enactment. Although we acknowledge that the structure of the Act suggests that the length of the extension depends upon the patented product's proximity to commercialization, there is no ba-

sis for the court's conclusion that the '433 patent is entitled to no extension. That is, even if the district court's assumed statutory scheme is correct, we cannot say that a patent for a drug such as Trental would have been entitled to no extension under such a scheme. The Trental patent could have been entitled to a one year maximum extension under the district court's perceived continuum. However, the fact is, Congress neglected to assign *any* limitation on the length of a term extension for the small number of patents for drugs which received approval shortly before enactment of the Act. Thus, we conclude that the district court's assignment of a zero term extension to the '433 patent is erroneous because it is speculative and disregards express provisions of the statute which render the '433 patent eligible for a term extension. *See United States v. Locke*, 471 U.S. 84, 95, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) ("But the fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do.").

■ Legislative history indicating that Congress wished to establish different maximum periods of extension in order to provide greater incentive for future innovations does not compel a contrary conclusion. *See* House Report I at 41, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 2674. As noted above, legislative history pertaining to *how* and *why* the length of term extensions should be limited is irrelevant to whether a patent is eligible for an extension. At best, the legislative history relied upon by the district court teaches that one of the goals of the Act was to promote future innovation. However, we also know that another purpose of the Act was to compensate companies that had already invested in the development of new pharmaceuticals by restoring some of the patent term that had been lost during the regulatory review process. *See* House Report II at 5–6, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 2689–90. Although it is true that Congress had to draw

a line somewhere in order to promote these dual goals, we do not agree that Congress chose to draw that line in the provision of the statute pertaining to maximum term extensions. Rather, the first line Congress chose to draw between which patents are and are not potentially eligible for an extension can be found in Section 156(d)(1) which requires that a patent owner apply for a term extension within sixty days after regulatory approval. By excluding all patents for drugs which were approved prior to sixty days before enactment of the Act, Congress statutorily limited the universe of patents eligible for a term extension. Because Hoechst applied for a patent term extension on October 29, 1984, which was within 60 days of FDA approval, the '433 patent falls within that universe under the express terms of the statute.

## VII.

Although we are convinced that the plain language of the statute and the relevant legislative history mandate that a term extension be given to the '433 patent, we acknowledge that a 6.8 year term extension is a windfall for Hoechst that was probably not contemplated by Congress. Indeed, the undisputed fact that Congress wished to limit the maximum term extension to five years is what motivated the Commissioner to deny Hoechst a term extension in the first place. Nevertheless, "it is not for us to distort the statute to 'fix' what Congress either intentionally or inadvertently failed to anticipate." *Unimed, Inc. v. Quigg,* 888 F.2d 826, 829, 12 USPQ2d 1644, 1647 (Fed.Cir.1989); *see Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 51, 75 L.Ed. 156 (1930) ("Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.").

## CONCLUSION

Accordingly, the judgment of the district court is reversed. We remand this case to the district court for it to remand this case to the Commissioner with instructions for him to grant Hoechst a 6.8 year term extension for the '433 patent, per the statutory formula.

REVERSED AND REMANDED.